UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DONNA H.,                         :
                                  :
        Plaintiff,                :
                                  :
        v.                        :  CASE NO. 3:20-cv-1879 (SRU)
                                  :
KILOLO KIJAKAZI, Acting           :
Commissioner of Social            :
Security,[1]                      :
                                  :
        Defendant.                :

**RECOMMENDED RULING ON PENDING MOTIONS**

Donna H. ("plaintiff") appeals the final decision of the Commissioner of Social Security ("the Commissioner" or "defendant") pursuant to 42 U.S.C. § 405(g). The Commissioner denied plaintiff's application for Social Security Disability Benefits in a decision dated October 23, 2020. Plaintiff timely appealed that decision.

Currently pending before the Court are plaintiff's motion to reverse or remand her case for a hearing (ECF No. 20) and defendant's motion to affirm the Commissioner's decision (ECF No. 22). The Honorable Stefan R. Underhill referred these motions to the undersigned for a recommended ruling.

---

[1] Andrew M. Saul was Commissioner of Social Security when this case was filed. On July 9, 2021, Dr. Kilolo Kijakazi became Acting Commissioner. Pursuant to Federal Rule of Civil Procedure 25(d), Acting Commissioner Kijakazi is automatically substituted as the defendant. *See* Fed. R. Civ. P. 25(d).

For the reasons discussed below, the Court recommends that plaintiff's motion to remand be GRANTED and defendant's motion to affirm be DENIED.

I.   Background

**A. Relevant Factual Background**

On May 23, 2018, plaintiff Donna H. ("plaintiff") filed a Title II application for disability insurance.  (R. 196-99.)[2] Plaintiff alleged a disability onset date of September 29, 2017, claiming that her asthma and IgG subclass 2 deficiency respiratory disorder impact and limit her ability to work.[3]  (R. 95.)

Plaintiff was 53 years old at the time of the alleged onset of disability and at the time she filed her applications.  (R. 94.)  Plaintiff completed twelfth grade and worked as an optician, respiratory therapist, and school cafeteria worker before she was unable to continue working.  (R. 45-46, 99.)

i.   *Pre-Onset Health Records[4]*

---

[2] Plaintiff last met the insured status requirement on December 31, 2017, her date last insured ("DLI").  (R. 13.)  Therefore, her application for disability insurance will relate to the finite period of time between September 29, 2017 through December 31, 2017.

[4] The plaintiff in this matter filed a statement of material facts in conjunction with the motion to reverse the decision of the Commissioner (dkt. #20-1).  The defendant has provided a response to that statement (dkt #22-2) indicating areas of disagreement.  The Court is utilizing these statements and reviewing the record in synthesizing the facts of this case.

Plaintiff's treatment records date back to 2010, indicating that plaintiff was treated at St. Francis Hospital from September 14 through 17. (R. 454.)  These early records indicate treatment for plaintiff's "medical history of moderate persistent asthma." (R. 454.) Following a course of steroids and nebulizer treatment, plaintiff was discharged and sent home and told to follow up with a pulmonologist and her primary care physician.  (R. 455-56.)

Later, the record indicates that plaintiff sought treatment with Doctor Hsu and Dr. Whittington at Yale New Haven Hospital ("YNHH") in May of 2014. (R. 322-24.) This treatment related to plaintiff's IgG2 subclass deficiency.  (R. 322.) These records indicate a review of plaintiff's symptoms related to asthma as well.  The records indicate control with medication and that plaintiff "is doing much better" following recovery from an upper respiratory infection. (R. 322.)  The record does indicate plaintiff was presenting with headache, cough, chest tightness, shortness of breach and wheezing, as well as ear pain, congestion, postnasal drip and sinus pressure. (R. 322-23.)

In July of 2014 plaintiff followed up with her primary care physician Dr. Mark Polatnick regarding her asthma. (R. 473.) Plaintiff described her symptoms as moderate and included wheezing and a cough. (R. 473.)  The record indicates that the main reason for plaintiff's visit was asthma, however, other

3

active problems included hypothyroidism, IgG2 subclass deficiency, irritable bowel syndrome, and migraines. (R. 474.) The physical examination notes in the record indicate normal findings. (R. 475.)  Dr. Polatnick also noted some changes to plaintiff's regimen of asthma medication. (R. 475.)

Plaintiff next treated in September 2014, again at YNHH with Dr. Hsu relating to her IgG2 subclass deficiency. (R. 324.) Dr. Hsu noted some changes to plaintiff's symptoms and her medication regimen. (R. 324-25.) Upon examination plaintiff presented with "cough upon deep inspiration." (R. 326.)  In November of 2014 plaintiff followed up with Dr. Polatnick for a routine visit. (R. 467-71.) The only noted findings related to a granular feel to plaintiff's thyroid. (R. 469.)

In February of 2015, plaintiff followed up with Dr. Hsu at YNHH once again regarding her IgG2 subclass deficiency. (R. 326.) Plaintiff reported a few instances of illness, however, she is noted as "[d]oing relatively well this winter." (R. 327.) The record notes that plaintiff is considering a return to work and is happy with how she is doing.  (R. 327.)  Plaintiff followed up again with Dr. Hsu on June 24, 2015 and is noted as doing well since her last visit.  (R. 328.)  Upon physical examination plaintiff is noted as having a deviated septum, pallor, and 1+ pallor/edema. (R. 329.)  All other signs appear to be normal.

The following November plaintiff returned to Dr. Polatnick for another routine visit. (R. 457.) The record indicates that plaintiff "is well and presents without complaint." (R. 457.) There is a list of plaintiff's "active problems" consisting of asthma, back spasm, fatigue, gastroesophageal reflux, hypothyroidism, IgG2 subclass deficiency, irritable bowel syndrome, and migraine headaches. (R. 459.)  However, the findings from the physical exam of plaintiff are all normal. (R. 459.)

In December 2015 plaintiff, once again, returned to YNHH and was seen by Dr. Hsu for her follow up on her IgG2 subclass deficiency. (R. 332.) Beyond noting issues related to a deviated septum and pallor, plaintiff presented as stable and all other examination findings were generally normal, with a cough noted. (R. 333.)

Plaintiff's next medical visit was a visit on September 22, 2016 to Dr. Polatnick complaining of a migraine headache. (R. 448.) This issue was noted to be recurrent, and the current episode of two migraines per week has started one month ago. (R. 448-49.) Dr. Polatnick noted abnormal coordination, but otherwise normal physical findings. (R. 449-50.)  Plaintiff, again, returned to Dr. Polatnick on December 13, 2016 (R. 441.) The notes from the visit indicate the usual designation of diagnoses, but all examination findings are otherwise noted to

be normal beyond back spasms and right knee pain. (R. 444-45.)
Plaintiff, on the following day, December 14, 2016, returned to
Dr. Hsu for a follow up at YNHH. (R. 333.) Plaintiff is noted as
having had slight illness, but overall to be doing well in
relation to her IgG2 subclass deficiency. (R. 334-35.) As with
previous visits, Dr. Hsu noted pallor/edema. (R. 335.)

Plaintiff next visited with Dr. Polatnick in April of 2017
with the chief complaint of dual ear infections. (R. 428.)
Beyond her ear pain, plaintiff's physical examination was
otherwise noted to be normal. (R. 430.)  On June 14, 2017
plaintiff returned to YNHH and was seen by both Dr. Kaur, an
Allergy and Immunology Fellow, and Dr. Hsu.  (R. 339.) At this
visit plaintiff exhibited as normal upon examination.  Drs. Kaur
and Hsu noted a history of hypogammaglobulinemia and asthma. (R.
338.)

ii.  *Post-Onset Health Records*

The medical records continue following the alleged onset
date of plaintiff's disability.  On October 30, 2017 plaintiff
was seen by Dr. Polatnick for a complaint regarding Cellulitis
of her left ear. (R. 422-24.)  Plaintiff presented as normal
during the physical examination, aside from issues related to
her left ear. (R. 424.) Less than one month later, on November
27, 2017, plaintiff returned to Dr. Polatnick with a complaint
related to her asthma. (R. 416.)  Dr. Polatnick noted

plaintiff's complaints included chest tightness, cough, frequent throat clearing, hoarseness, shortness of breath and wheezing. (R.416.) The doctor indicated that this episode had occurred for about 10 days, but this was a recurrent problem.  It was also indicated that the problem has been waxing and waning. (R. 416.) Plaintiff informed the doctor that there was minimal improvement with treatment. (R. 416-17.)  The remaining physical examination findings from this visit, aside from wheezing, indicate no other abnormal medical presentation. (R. 417-19.) A chest x-ray was ordered at this visit. (R. 419.)

On December 6, 2017 plaintiff returned to YNHH and was seen by Dr. Hsu, and Fellow Dr. Jenny Shin. (R. 339-44.) The notes in the record indicate one respiratory infection in November, which was addressed with antibiotics and prednisone. (R. 339.) The notes add that in relation to her asthma, plaintiff does not have any complaints of wheezing or shortness of breath. (R. 340.) The assessment and plan from Dr. Shin also indicate an increasing frequency of infections. (R. 343.) In the Attending Addendum from Dr. Hsu, it is noted that plaintiff has had an increase in infections in the past year and that causes her asthma to flare and require treatment. (R. 343-44.)

Plaintiff's next treatment, which the Court notes is after the date last insured, was with Dr. Polatnick on February 26, 2018. (R. 403.) Plaintiff's chief complaint is noted to be a

headache and nausea. (R. 403.) The review of systems notes reports of fatigue, abdominal distention, nausea, vomiting, tremors, and headaches. (R. 405.)  Dr. Polatnick conducted a physical examination and noted findings of abdominal distension and tenderness, as well as musculoskeletal trigger point tenderness.  (R. 406.) Plaintiff was prescribed medication for nausea and told to report to the emergency room upon any exacerbation of symptoms. (R. 407.)

Plaintiff was seen again on April 30, 2018 for an annual exam, at which plaintiff presented with mild expiratory wheezing upon examination. (R. 400.)  Plaintiff was noted to have had a difficult year but felt that she had improved. (R. 396.) In May and June of 2018, YNHH records indicate a number of tests at the request of Dr. Hsu. (R. 548-49.) Following these tests Dr. Hsu noted no acute cardiopulmonary findings. (R. 548.)

Plaintiff was then seen by APRN Michele Marek, in the same practice as Dr. Polatnick, on August 21, 2018.  (R. 485.) Plaintiff complained of a sore throat and asthma.  (R. 485.) The notes of the visit indicate plaintiff presented with pharyngitis and intermittent fever and cough for two weeks.  Additionally, there is reference to some yellow-green mucous, plaintiff's asthma, IgG deficiency, and list of medications.  Plaintiff is also noted to have been exposed to strep while traveling to Disney and denied chest pain and shortness of breath.  (R. 485-

86.) The notes also include reference to a physical examination which found minimal injection pharynx and cervical noted site tenderness. (R. 488.) All other physical examination findings were normal. (R. 488.)

At this time, plaintiff also began to see Dr. Kaiser Toosy, a specialist in pulmonary care. (R. 520.) Dr. Toosy performed an initial evaluation of plaintiff in July 2018.  Upon her initial visit Dr. Toosy noted that it was a perplexing situation, as plaintiff had normal spirometry during the visit but was visibly short of breath. (R. 522.) Dr. Toosy indicated a belief that anxiety may have played a role in this presentation.  (R. 522.) Dr. Toosy went on to note that plaintiff's asthma had not been completely controlled for years and was not at that time. Therefore, some medications were continued, and others added. (R. 522.)  A review of the physical examination indicates generally normal findings. (R. 522.)  In a subsequent letter, Dr. Toosy indicated that plaintiff's cough had improved with treatment, as had her breathing. (R. 524.) Dr. Toosy indicated continued shortness of breath upon exertion, but not as severe as previously stated. (R. 524.)

Plaintiff returned to Dr. Polatnick with a chief complaint of asthma on November 11, 2018.  (R. 602.)  The notes from the visit indicate complaints of chest tightness, cough, shortness of breath and wheezing.  (R. 602.) The problematic episode had

lasted seven days but was improving. (R. 602.) During a physical examination plaintiff had no abnormal presentations noted. (R. 604-05.) Plaintiff later followed up with Dr. Polatnick in March and August of 2019. (R. 608-10.) Plaintiff complained of fever and cardiogenic pulmonary edema, no abnormal medical findings were noted in the record. (R. 608-10.)

Plaintiff's medical records conclude with a visit with Dr. Toosy related to her severe persistent asthma. (R. 593.) Plaintiff had worsening condition, following the reduction of her prednisone dosage, and had been coughing up thick white sputum. Plaintiff reported night sweats and severe sweat with even mild exertion. (R. 593.) Dr. Toosy noted her severe asthma and maximal therapy with chronic prednisone and dupixent since 2018. (R. 595.)

## B. Administrative Proceedings

The Social Security Administration denied plaintiff's claims initially on August 9, 2018 and upon reconsideration on November 20, 2018. (R. 11.) On January 18, 2019, plaintiff requested a hearing before an ALJ. (R. 11.) On November 15, 2019, ALJ Michael McKenna presided over plaintiff's hearing, during which plaintiff and Vocational Expert ("VE") Dennis J. King both testified. (*See* R. 11, 39-92.)

   i. *The Hearing*

During the hearing, plaintiff testified that she resides in a single-family home with her spouse and two children. (R. 43-44.) Plaintiff possesses a valid driver's license and stated that she would drive two to three times a week. (R. 45.) Plaintiff also testified that she would sometimes require assistance from neighbors in caring for her two young children. (R. 79-80.) Plaintiff reported that she had gone to school for, and previously worked as, an optician and a respiratory therapist. (R. 45-46.) Plaintiff's main work as a respiratory therapist was performed both in a hospital setting and at patients' homes. (R. 47-52.) Plaintiff asserted that this work included running ventilators, moving patients, and educating patients on the use of machines and equipment in their homes. (R. 48-52.) Plaintiff testified that she stopped working in 2012 due to exposure to contaminants within people's homes and at the urging of her doctors due to her increased infections (R. 55-57.)

Plaintiff testified that she had previously been a runner and had taken kickboxing classes. (R. 64.) Additionally, plaintiff indicated a need to have her spouse perform activities such as carrying laundry up and down stairs. (R. 64.) Plaintiff estimated she could probably lift up to 10 pounds and would be off-task during the day because of her respiratory condition. (R. 64-68.) Plaintiff also indicated that she had traveled

11

following her date last insured to places such as Maine and New York, however, she testified that her family was active doing things but she just sat on the beach. (R. 68.)

Vocational Expert ("VE") Dennis King testified that plaintiff had the past relevant work of a respiratory therapist which the DOT classified as medium, but plaintiff performed at the very heavy level. (R. 84-85.) The ALJ then questioned VE King regarding hypothetical individuals with plaintiffs' profile and additional limitations. (R. 85.) The VE opined that such an individual could perform plaintiff's past relevant work in the hospital setting, if not exposed to the outdoors. (R. 86.) VE King further identified three jobs that an individual with plaintiff's eventual RFC could perform: Survey Worker, Fundraiser, and Mail Sorter. (R. 86.) All of these jobs are performed at the light exertion level.

  ii.  The ALJ's Decision

On December 3, 2019, the ALJ issued an opinion in which he found that plaintiff "was not under a disability, as defined in the Social Security Act, at any time from September 29, 2017, the alleged onset date, through December 31, 2017, the date last insured." (R. 19.)

At Step One, the ALJ found that plaintiff did not engage in substantial gainful activity from September 29, 2017, the alleged onset date through her date last insured, which is

December 31, 2017.[5]  (R. 13.)  At Step Two, the ALJ found that
plaintiff had the following severe impairments through her date
last insured: asthma and hypogammaglobinemia.  (R. 13.)

At Step Three, the ALJ found that plaintiff's impairments,
singularly and combined, did not meet or medically equal the
severity of a listed disability in 20 C.F.R. § 404, Subpart P.,
App. 1.  (R. 13.)  The ALJ specifically noted that he considered
listing 3.03.  (R. 13.)

Next, the ALJ determined that plaintiff had the residual
functional capacity (RFC) to

> Perform a full range of work at all exertional levels
> but with the following nonexertional limitations: the
> claimant cannot tolerate concentrated exposure to
> extreme cold, humidity or wetness.  The claimant cannot
> tolerate moderate exposure to dusts, fumes, gases, odors
> or poor ventilation.

(R. 15.)

At Step Four, the ALJ found that plaintiff was capable of
performing her past relevant work as a respiratory therapist.  (R.
18.)  Finally, at Step Five, the ALJ relied upon the opinion of a
Vocational Expert to conclude that, beyond her past relevant work,
plaintiff could also perform other jobs that exist in significant
numbers in the national economy, such as survey worker, fundraiser,

---

[5] The ALJ noted that the plaintiff did perform limited work following
the alleged onset date, but that work "did not rise to the level of
substantial gainful activity." (R. 13.)

and mail sorter. (R. 19.) Thus, the ALJ concluded that plaintiff
was not disabled from the onset date of September 29, 2017 through
December 31, 2017, the date last insured. (R. 19.)

## II. Legal Standard

"A district court reviewing a final . . . decision [of the
Commissioner of Social Security] pursuant to section 205(g) of the
Social Security Act, 42 U.S.C § 405(g), is performing an appellate
function." Zambrana v. Califano, 651 F.2d 842, 844 (2d Cir. 1981).[6]
"The findings of the Commissioner of Social Security as to any
fact, if supported by substantial evidence, [are] conclusive . .
. ." 42 U.S.C. § 405(g). Accordingly, the court may not make a
*de novo* determination of whether a plaintiff is disabled in
reviewing a denial of disability benefits. Id.; Wagner v. Sec'y
of Health and Human Servs., 906 F.2d 856, 860 (2d Cir. 1990).
Rather, the court's function is to ascertain whether the
Commissioner applied the correct legal principles in reaching her
conclusion, and whether the decision is supported by substantial
evidence. Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987).

Therefore, absent legal error, this Court may not set aside
the decision of the Commissioner if it is supported by substantial
evidence. Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

---

[6] Unless otherwise indicated, in quoting cases, all internal quotation
marks, alterations, emphases, footnotes, and citations are omitted.

Further, if the Commissioner's decision is supported by substantial evidence, that decision will be sustained, even where there may also be substantial evidence to support the plaintiff's contrary position. Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982).

The Second Circuit Court of Appeals has defined substantial evidence as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Williams on Behalf of Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). Substantial evidence must be "more than a scintilla or touch of proof here and there in the record." Williams, 859 F.2d at 258.

The Social Security Act ("SSA") provides that benefits are payable to an individual who has a disability. 42 U.S.C. § 423(a)(1). "The term 'disability' means . . . [an] inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment. . . ." 42 U.S.C. § 423(d)(1). To determine whether a claimant is disabled within the meaning of the SSA, the ALJ must follow a five-step evaluation process as promulgated by the Commissioner.[7]

---

[7] The five steps are as follows: (1) the Commissioner considers whether the claimant is currently engaged in substantial gainful activity; (2) if not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities; (3) if the claimant has a "severe impairment," the Commissioner must ask whether, based solely on the medical evidence, the claimant has an impairment listed in Appendix 1 of the

To be considered disabled, an individual's impairment must be "of such severity that he is not only unable to do his previous work but cannot . . . engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). "[W]ork which exists in the national economy means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." Id.[8]

III. Discussion

In seeking the reversal or remand of the Commissioner's decision, plaintiff argues that the ALJ erred in the following ways: the ALJ erred in the analysis of severity at step two; the ALJ failed to adequately consider plaintiff's combination of impairments; the ALJ failed to properly evaluate the Opinion evidence; and the ALJ failed to adequately develop the record.

_____

regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him or her disabled, without considering vocational factors such as age, education, and work experience; (4) if the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has the residual functional capacity to perform his or her past work; and (5) if the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps. 20 C.F.R. § 416.920(a)(4)(i)-(v).

[8] The determination of whether such work exists in the national economy is made without regard to: 1) "whether such work exists in the immediate area in which [the claimant] lives;" 2) "whether a specific job vacancy exists for [the claimant];" or 3) "whether [the claimant] would be hired if he applied for work." Id.

(Pl.'s Br., dkt. 20-2 at, 1–18.)   As set forth below, the Court
finds that the ALJ has failed to develop the record and
therefore recommends that plaintiff's motion to reverse or
remand be GRANTED and the Commissioner's motion to affirm be
DENIED.[9]

A. **The ALJ's Development of the Record**

In the non-adversarial disability benefits proceedings, an
ALJ has an affirmative duty to develop the administrative
record.  *See* Perez v. Charter, 77 F.3d 41, 47 (2d Cir. 1996).
"However, the duty to develop the record is not absolute, and
requires the ALJ only to ensure that the record contains
sufficient evidence to make a determination." Johnson v. Comm'r
of Soc. Sec., No. 17-cv-5598, 2018 WL 3650162, at *13 (S.D.N.Y.
2017).  "Where there are no obvious gaps in the administrative
record, and where the ALJ already possesses a complete medical
history, the ALJ is under no obligation to seek additional
information in advance of rejecting a benefits claim." Swiantek
v. Comm'r of Soc. Sec., 588 F. App'x 82, 84 (2d Cir. 2015).

In this instance the plaintiff argues that the ALJ did not
properly consider the opinion evidence in the record.  The
plaintiff contends that this failure to properly credit the

---

[9] Analysis of the plaintiff's other arguments at this time is
unnecessary, if the record is not sufficiently developed it would be
futile to analyze whether there was error by the ALJ in his review or
analysis of that insufficiently developed record.  The Court will not
opine on the plaintiff's remaining claims of error.

opinion evidence leaves a gap in the record during the time period of inquiry in this case. Further, the logical conclusion would be that the ALJ has the affirmative duty to fill that gap in the record.

The Commissioner argues that the ALJ did not have a duty to fill in any gaps or further develop the administrative record. First, the Commissioner argues that the ALJ credited the prior administrative findings in reaching its RFC determination. Thus, the Commissioner would assert, if the ALJ needed medical opinion evidence to support the RFC, that burden has been met. Second, the Commissioner asserts that it is not necessary to seek additional medical opinion evidence where the record contains sufficient evidence to allow the ALJ to assess a claimant's RFC.

Whether the ALJ has fulfilled this duty is a threshold question that "exists even when the claimant is represented by counsel." Phelps v. Colvin, 20 F. Supp. 3d 392, 401 (W.D.N.Y. 2014). When a plaintiff argues that the ALJ failed to develop the record, "the issue is whether the missing evidence is significant, and plaintiff bears the burden of establishing such harmful error." Parker v. Colvin, No. 3:13-cv-1398 (CSH), 2015 WL 928299, at *12 (D. Conn. Mar. 4, 2015).

Courts within the Second Circuit have held that "it is not per se error for an ALJ to make a disability determination

without having sought the opinion of the claimant's treating

physician." Delgado v. Berryhill, No. 17-CV-54, 2018 WL 1316198,

at *8 (internal quotations and citations omitted). It has been

further held that when "the record contains sufficient evidence

from which an ALJ can assess [a claimant's] residual functional

capacity," the absence of treating source opinions will not

require remand. Tankisi v. Comm'r of Soc. Sec., 521 F. App'x

29, 34 (2d Cir. 2013) (summary order).

> According to the Tankisi court, the "sufficient
> evidence" standard evidence was at least **met when the**
> **medical records were "extensive," "voluminous," and**
> **included "an assessment of [the claimant's] limitations**
> **from a treating physician."** Tankisi, 521 F. App'x. at
> 34. In interpreting Tankisi, another Judge in this
> District has found that, "[i]n essence, [it] dictates
> that remand for failure to develop the record is
> situational and depends on the circumstances of the
> particular case, the comprehensiveness of the
> administrative record, and ... whether an ALJ could
> reach an informed decision based on the record. Holt v.
> Colvin, No. 16-CV-1971, 2018 WL 1293095, at *7 (D. Conn
> Mar. 13, 2018) (internal quotations and citations
> omitted)

> Angelica M. v. Saul, No. 3:20-CV-00727 (JCH), 2021 WL

2947679, at *5 (D. Conn. July 14, 2021)(emphasis added).  In

Angelica M., the Honorable Janet C. Hall indicated that having

any medical source statement will not be dispositive on this

issue.  See Id. at *5. The question turns on the sufficiency of

the underlying medical records in addressing a claimant's work

limitations.  It is additionally worth nothing that

> Tankisi, its progeny, and the case law interpreting the
> obligation of an ALJ to seek medical source statements
> to develop the record all deal with claims made when the
> old treating physician rule was in effect, and predate
> the introduction of the new regulations for considering
> medical opinions for claims filed on or after March 27,
> 2017. 20 C.F.R § 404.1520c; 20 C.F.R. § 404.1527.

Id. at *6. Under the new regulation, the ALJ does not have to

provide controlling weight of defer to a specific medical

opinion, the inquiry is now focused on matters of

supportability, consistency, and the relationship with the

claimant. 20 C.F.R. § 404.1520c.  Judge Hall, in analyzing the

Tansiki decision, concluded that even if not given controlling

weight under the new regulation, medical source statements and

opinions are still valued "because they afford[] physicians the

opportunity to explicitly assess the claimant's limitations and

RFC, a necessary component of developing the record." Angelica

M., 2021 WL 2947679, at *6.

Upon review of the relevant documents, the Court notes,

that plaintiff is seeking Social Security benefits for a short

period of time, from September 2017 through December 2017.

Further, as made clear in the discussion above, plaintiff was

seen by a number of medical providers before, during, and after

the relevant time period.  Of note, only Dr. Toosy provided a

medical opinion form in the course of the application and

hearing process.  (R. 531-534 and 589-592.)

The ALJ, however, determined that Dr. Toosy's medical opinion was not persuasive for the relevant time period. (R. 17.) The ALJ noted that Dr. Toosy did not treat the plaintiff until after the relevant time period and noted a worsening condition. (R. 17.) As such, it appears that the ALJ did not believe that the opinion could shed much, if any, light on the plaintiff's condition during the relevant time period.

The ALJ also considered the "assessments provided by the State Agency consultants." (R. 17.) The ALJ found these to be generally consistent with the evidence in the record and finds them to be persuasive. (R. 17-18.) After reviewing the records of the State Agency consultants, the Court notes that the forms were signed on August 2, 2018 and November 20, 2018. (R. 101 and 113.) As with Dr. Toosy's treatment of plaintiff, this was after the close of the period of alleged disability.  Further, it does not appear that the providers who authored these documents met with or examined plaintiff, rather their opinions are based on a review of plaintiff's medical records. (R 94-113.)

The Court is not inclined to challenge or disagree with the findings of the ALJ regarding the persuasiveness of Dr. Toosy's medical opinion or that of the State Agency Consultants. The Court's principal concern is that the result of the ALJ's determination regarding Dr. Toosy's opinion leaves the record devoid of any medical source statements from anyone who actually

examined the plaintiff.  Upon review of the record it is not
clear to the Court that the ALJ made any attempt to contact and
request a medical source statement from any of plaintiff's other
treating physicians, despite the fact that the record
establishes that such other treating physicians exist.  In
failing to do so the ALJ neglected to fill a gap in the record
that his decision created.

        As previously mentioned, the relevant time period at issue
in this matter is finite.  A review of the treatment records
indicates that plaintiff sought out medical treatment from her
established medical providers on multiple occasions during the
relevant time period.  The question now turns on whether these
treatment records which were available to the ALJ allowed the
ALJ to determine if plaintiff was disabled or not during the
relevant time.

        Indeed, the essential question is whether the record
contained sufficient evidence for the ALJ to assess plaintiff's
functional limitations.  *See* Keovilay v. Berryhill, No. 3:19-cv-
735 (RAR), 2020 WL 3989567, at *4 (D. Conn. July 15, 2020);
Moreau v. Berryhill, No. 3:17-cv-396 (JCH), 2018 WL 1316197, at
*7 (D. Conn. Mar. 14, 2018).  Whether a record contains
sufficient evidence without treating source opinions is a fact-
specific inquiry that hinges on the "circumstances of the
particular case, the comprehensiveness of the administrative

22

record," and whether the record "was sufficiently comprehensive
to permit an informed finding by the ALJ." Sanchez v. Colvin,
No. 13-cv-6303 (PAE), 2015 WL 736102, at *5-6 (S.D.N.Y. Feb. 20,
2015).

Given the specific circumstances surrounding this case, the
short period of time involved, the long-term relationship
plaintiff had with some of the medical providers, and the lack
of functional limitations discussed in the medical treatment
notes, the Court concludes that the ALJ had an obligation to
further develop the record. Plaintiff's treating physicians
could have shed light on plaintiff's condition during the
relevant time period and explained what their notes meant. Of
note, Dr. Hsu's addendum to the treatment notes of a December 6,
2017 examination of the plaintiff state: "[plaintiff] appears to
be having increased rate of respiratory infections this year
that also cause asthma flare and require treatment with
antibiotics and prednisone." (R. 343.) Dr. Hsu notes other
infections that also required treatment. (R. 343-44.) A review
of Dr. Hsu's records does not show a voluminous record
containing clear indications of plaintiff's functional
limitations during the relevant period. A medical opinion from
Dr. Hsu would have provided additional information to allow the
ALJ to form a clearer picture of plaintiff's condition during
the relevant period.

Additionally, records from Dr. Polatnick note that months after the plaintiff's DLI, in April of 2018, plaintiff was having a "challenging **year** with recurrent Pulmonary issues, Patient feels that she has improved, but still gets dyspneic with minimal exertion." (R. 396)(emphasis added).  This period of time, which overlaps with Dr. Toosy's treatment of plaintiff, raises questions as to what was happening during the relevant time period.  Furthermore, it does not appear to the Court that the medical visit notes included in the records are sufficient to answer this question.  Most of the records indicate that plaintiff suffers from asthma, among her other ailments.  The records indicate reported symptoms and generally normal findings upon physical examination.  The Court notes however, that those physical examinations were done on systems both related and unrelated to plaintiff's alleged disabling conditions.  There was little to no narrative or opinion contained within the notes to provide the ALJ guidance necessary to fully evaluate plaintiff's RFC.  As such, the ALJ could have and should have sought out medical source opinions from the medical providers working with the plaintiff at the time at issue in this case. Failure to do so left the ALJ to base the RFC determination off bare medical notes from office visits, and State Agency consultant reports based on those very same medical records.  It is unclear to the Court how the ALJ was able to fully develop a

picture of plaintiff's functional limitations without more information.

IV.   Conclusion

For the foregoing reasons, the Court recommends that plaintiff's motion to reverse or remand the Commissioner's decision be GRANTED and the defendant's motion to affirm the same be DENIED.

This is a recommended ruling. **Any objections to this recommended ruling must be filed with the Clerk of the Court within fourteen (14) days of being served with this order.** *See* Fed. R. Civ. P. 72(b)(2). Failure to object within fourteen (14) days may preclude appellate review. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), & 72; D. Conn. L. Civ. R. 72.2(a); F.D.I.C. v. Hillcrest Assoc., 66 F.3d 566, 569 (2d Cir. 1995); Small v. Sec'y of H.H.S., 892 F.2d 15, 16 (2d Cir. 1989) (per curiam).

SO ORDERED this 1th day of March, 2022 at Hartford, Connecticut.

_____/s/_____

Robert A. Richardson
United States Magistrate Judge